*Exhibit 4*

## SWORN AFFIDAVIT OF WITNESS TESSIE TAYLOR

I, Tessie Taylor, being first duly sworn upon oath, depose and state as follows:

1. My name is Tessie Taylor. I am over the age of 18 and competent to testify to the matters stated herein. The information contained in this affidavit is based upon my personal knowledge unless otherwise indicated.

2. In April 2022, I relocated from Twentynine Palms, California, to Stillwater, Oklahoma, with my husband and my minor son. This move occurred after my husband's discharge from the United States Navy.

3. My son just turned 5 on April 16th, and he has an autism diagnosis.

4. Since relocating to Oklahoma, I have been subjected to ongoing domestic violence and coercive control, which has significantly impeded my ability to safely leave the situation. Despite repeated efforts to seek protection and support, the abuse has escalated over time and remains unresolved to this day. My son's father and I

separated shortly after our move and have been living in separate residences since around June 2022.

5. The first critical incident occurred in 2023 during a scheduled child custody exchange with my estranged husband. During that exchange, I was placed in a situation where I feared for my safety and was compelled to call 911 for assistance.

6. At least two additional 9-1-1 calls were made: one by a friend who was on FaceTime with me during the altercation, and another by a neighbor who later informed me that they called after hearing a man screaming threats against a woman and pounding on her door.

7. When the sheriff arrived, my son's father was already speaking with him and appeared to have a friendly rapport. The sheriff failed to ask me any questions, declared the matter "civil," and left without offering any assistance or information on protective measures. The responding Sheriff's name was Tomm Edwards. The following day, when I requested a copy of the report, I was informed that no report had been taken. I expressed disbelief given the multiple emergency calls, and the dispatcher—who admitted she took my call—became hostile and reiterated that no report was filed.

8. Following the 911 call incident in 2023, additional domestic violence events occurred throughout the remainder of 2023 and into 2024. Many of these incidents were unreported due to fear, coercion, and systemic failures that left me without meaningful protection or recourse. Shortly before my son's father officially filed for divorce, we both independently retained private legal counsel to represent us. With the help of a friend, I had set up free consultations with what we had determined to be two of the best options in Payne County. My friend scheduled and also attended with me, consultations with James Murray, and then immediately afterwards Richard Johnson. The consultation with James Murray made me feel like I was on trial- he was aggressive and condescending despite me having a 3,000 check in my purse that was ready to have an attorney's name on it and be cashed that day. Richard Johnson offered a consultation that was completely opposite of Murray, with me deciding to hire him and paying a 3,000 retainer fee that day for his representation.

9. In early 2024, my husband initiated divorce proceedings. From that point forward, the situation deteriorated rapidly. With the assistance of our respective legal counsel, we drafted and signed a temporary

custody agreement. My attorney at the time was Richard Johnson, from the private firm Holmes, Yates, & Johnson located in Stillwater. My son's father's attorney, who is still is attorney on record, is Thomas Swafford, from the private firm Wilson, Stephens & Swafford also located in Stillwater. This temporary custody agreement was never formally filed with the court or entered into OSCN, rendering it legally unenforceable. I was never provided a clear explanation by counsel as to why this document was left off the official docket, and I now question whether this omission was intentional done to further victimize me.

10.    I made numerous attempts to seek assistance from domestic violence resources in Stillwater and neighboring jurisdictions. I contacted shelters, advocacy groups, and regional service providers, only to be repeatedly denied support or referred to agencies that could not offer meaningful help.

11.    My son's father's behavior escalated in early 2024 and became increasingly retaliatory and manipulative. He began withholding access to my son without justification and used threats, intimidation, and psychological abuse to exert control over me. I exhausted every

strategy I could to establish safe, cooperative communication, but my efforts were met with continued hostility and obstruction.

12.    On 7/31/24,, I was contacted by my son's ABA therapist while he was receiving therapy services at the center. My son was in the care of his father that day under the terms of our temporary custody schedule. I had not seen my son since the preceding Monday morning. The therapist reached out to me directly via text message, including a photograph, due to her serious concern about a large, open wound on my son's wrist.

13.    I picked up my son and transported him directly to an urgent care clinic for immediate medical evaluation. The attending physicians and nurses were initially uncertain of the cause due to the severity and unusual appearance of the lesion, but my son was eventually diagnosed with bullous impetigo, a contagious and painful bacterial skin infection.

14.    I informed his father via text shortly before we entered the urgent care facility. He did not respond until after the visit had concluded.

15.    Anticipating the continued need to provide care and the potential impact on my employment, I contacted my husband and asked that he

watch our son on Friday while I returned to work. My child's father agreed to watch him on the day of 8/03/24 while I was at work.

16.    When I picked my son up that evening between approximately 4:30 and 6:00 p.m., I immediately observed several concerning signs of neglect. His face appeared significantly worse, with visible signs of irritation and dried mucus. The lesions on his face were also significantly larger. It was evident that his face had not been wiped or cleaned throughout the day. He was also dressed in long-sleeved clothing, both shirt and pants, despite temperatures near 90 degrees Fahrenheit. I brought my dog with me during pickup, and my son's father met me outside with our son. Before placing my son in the car, I asked for the medication. His father retrieved it from inside the house and handed it to me. When I asked when the last dose had been administered, he admitted that he had not given any at all, claiming he "forgot," despite my repeated reminders.

17.    On the morning following morning, 8/04/24, which was a Saturday, I awoke to find that I, too, had developed worsening skin lesions consistent with impetigo. My son's facial condition had also deteriorated further, and it became clear to me that he required more

intensive medical care. I contacted his father via text to inform him that I would be taking our son to urgent care.

18.    After quickly bathing myself, I removed my son's long-sleeved shirt for the first time since picking him up from his father's home. Upon doing so, I was horrified to discover what appeared to be multiple, dark scratch marks across his back. Given my son's autism diagnosis and history of self-injurious behavior, I had no immediate reason to suspect third-party abuse and believed the injuries were likely self-inflicted. However, due to the alarming appearance and severity of the marks, I immediately determined that urgent care would not be sufficient, and that an emergency room visit was necessary.

19.    I dressed my son as quickly as possible, contacted his father again via phone and text, and transported him to the Stillwater Medical Center Emergency Room.

20.    I remained in the emergency room for approximately eight hours, advocating for my son while also undergoing a full investigation by law enforcement and hospital staff for potential child abuse. I had no prior notice or reason to expect that such an investigation would be initiated and cooperated fully and transparently. I spoke with both the

Stillwater Police Department and the Payne County Sheriff's

Department, and provided complete access to my son's recent medical

care and history.

21.     The attending physician at Stillwater Medical Center Emergency

Room documented that prior injury scans and evaluations were

unremarkable, with no indications of historical abuse. I was provided

discharge paperwork, and the treating physician verbally expressed

that there was no medical evidence supporting a finding of abuse or

neglect. Both law enforcement agencies, along with DHS, declined to

take further action at that time. I was allowed to take my son home

with no restrictions.

22.     I was issued a case number by a Payne County Sheriff and

informed that I would be contacted if further follow-up was necessary.

I was not advised of any active investigation against me nor was I

given any indication that law enforcement had reason to suspect I had

harmed my child.

23.     However, I later learned that law enforcement officials visited my

son's father's residence later that same evening. His father informed

me afterward that both police and sheriff's deputies questioned him

briefly and assured him the situation was not serious. Based on police and sheriff's reports, which I later obtained through DHS, after being denied access through all other records request avenues, I discovered that my son's father gave statements to law enforcement that appeared to implicate me as a potential perpetrator of physical abuse.

24.    My son's father's statements to police, made without evidence and despite his refusal to communicate or participate during the crisis, appear retaliatory and intended to cast suspicion on me.

25.    On the morning following the ER visit, a deputy from the Payne County Sheriff's Office arrived at my residence and photographed my son outside my home. Although the interaction was brief and appeared routine, I sensed that the tone of the investigation had shifted. Given a longstanding pattern of retaliation from my son's father in prior interactions, I began to fear that he had made false or misleading statements to law enforcement regarding my conduct.

26.    Despite these concerns, when I later obtained records of these early investigative reports, I found no adverse conclusions or negative commentary regarding my conduct. The documentation from that time period described my child as happy, calm, and not in any visible pain.

27.    During this particular week, my son's father deliberately withheld all communication from me and did not inform me that he was actively cooperating with an ongoing investigation involving the Oklahoma Department of Human Services (DHS) and the Payne County Sheriff's Office. I later learned that, during this time, he accompanied a DHS caseworker and a sheriff's deputy to the Saville Center in Stillwater for the purpose of conducting a forensic child interview and examination of our son—without notifying me, and without seeking or obtaining my consent. My son's father was in frequent contact with Morgan Stewart, a DHS Child Welfare caseworker and Sheriff deputy Tomm Edwards.

28.    I was not contacted, notified, or informed in any way that this forensic interview or medical evaluation was taking place. I only became aware of it well after the fact, upon obtaining records and documentation. During the interview, my son's father made several statements to forensic personnel that were demonstrably false.

29.    The nurse conducting the forensic examination reviewed photographs from the initial emergency room visit, taken three to four days earlier. At the time of the forensic exam, the physical evidence of

scratching had substantially healed, although impetigo lesions remained. Despite this, the nurse concluded based on the photos alone—without current physical injuries—that the child had been abused. The nurse who conducted this forensic evaluation is Brandi Watts, of the Saville Center in Stillwater. Additionally, she documented new injuries, including an alleged "forceful blow to the face," which were not documented during the ER visit. If such an injury did occur, it would have happened during the days when the child was in his father's custody, and not under my care.

30.    My son's father subsequently visited Wings of Hope Family Crisis Services and filed for a Victim Protective Order (VPO) on behalf of our child, alleging abuse. I was not informed of this action, nor was I provided any prior opportunity to respond or defend myself.

31.    On the following Thursday, 8/08/24—customarily the day I would retrieve my son from ABA therapy—I received a call at work from a Payne County Sheriff's deputy. The deputy stated that he needed to meet with me immediately to serve me with an undisclosed document. When I asked what it pertained to, he refused to answer over the phone.

32.    Alarmed, I left work early and contacted the deputy again. I insisted

that he inform me of the nature of the documents he planned to serve.

Only then did he disclose that it was a Victim Protective Order against

me—on behalf of my child. I was devastated. I was entirely unaware

that such a filing had occurred and had received no prior notice of the

allegations or proceedings. I was being accused, barred from seeing

my child, and placed under legal scrutiny—all without due process or

an opportunity to respond.

33.    After coordinating a meeting location with the Payne County

Sheriff's Office, I retrieved a copy of the VPO at a public gas station.

Upon review of the contents, I was shocked and deeply disturbed by

the claims presented within the petition.

34.    The VPO prohibited all contact between me and my minor child. I

was given no prior warning or opportunity to respond before this

prohibition was enacted. The psychological impact of being barred

from my child—especially under false pretenses—was immediate and

severe.

35.    Over the next two weeks, I experienced ongoing, aggressive contact

from both the Oklahoma Department of Human Services (DHS) and

the Payne County Sheriff's Office. Agents from both entities began

appearing at my private residence unannounced, knocking on my door

during hours when I was either working or unavailable. Morgan

Stewart from OKDHS and Sheriff Tomm Edwards were the

representatives from respective agencies that relentlessly contacted me

and left business cards on my property.

36.    I had previously informed the Sheriffs of my full-time work

schedule and provided accurate contact information, including a

working phone number and email. Despite this, neither agency utilized

those methods to schedule appointments or request interviews. Instead,

they repeatedly arrived at my home without notice, often during work

hours, aggressively beating on my door, and often leaving their

business cards, or calling and leaving voicemails demanding a

response from me.

37.    On several occasions, I was home when deputies knocked. These

visits were unannounced and intimidating. I chose not to open the door

or engage with them directly. Based on the pattern of conduct, I had

every reason to believe that these interactions were intended not to

gather facts impartially, but rather to provoke confrontation, escalate

fear, and create a false perception of guilt.

38.    I interpreted these visits as part of a coordinated and retaliatory

effort—enabled by my son's father—designed to intimidate, isolate,

and criminalize me under false allegations. I had not committed any

abuse or neglect, and the medical and investigative evidence available

at the time did not support any of the claims made against me.

39.    I continued to decline to communicate with law enforcement or

DHS personnel who showed up at my home without a warrant,

subpoena, or scheduled appointment. I understood my constitutional

rights and believed these uninvited visits constituted an inappropriate

and coercive tactic, likely undertaken in bad faith and in coordination

with my ex. When I did return the DHS caseworker's phone calls, I

spoke with Morgan Stewart, who continued to make me feel extremely

violated and uncomfortable. Morgan Stewart stated to me that I had to

participate in a meeting with him concerning "allegations"

immediately. I advised Morgan Stewart that I had a busy work

schedule and did not have any obligation to meet with him, because I

had private counsel that needed to be contacted and present in any

interactions with DHS. Morgan Stewart continued to call me, and deny my right to be aware of the allegations, stating that he was not able to disclose them over the phone, which I relayed to him was not legally correct and continued to direct him to my attorney. Morgan Stewart tried to pressure me into after hours visitation from him, laughing at me saying my lawyer did not need to be present and he repeatedly denied my request to meet at the DHS building with counsel present, stating that it was not necessary and not how things normally went.

40.    On the date of the scheduled VPO hearing, just prior to court, my son's father informed me that he had decided to visit Wings of Hope and request dismissal of the protective order.

41.    Unbeknownst to me, even after the protective order was dismissed, my son's father continued his communications with the Oklahoma Department of Human Services (DHS), feeding them false and misleading information to maintain the narrative that I had abused our child. These communications were done covertly and in bad faith. The only reason that I had suspicions of his interactions with DHS is because, the day the VPO was dismissed, my son's father allowed me to ride in his vehicle to retrieve my son from his new school, with him

as the driver. After picking up my child, he received a phone call from Morgan Stewart, and he was extremely upset and surprised that he was present for the VPO hearing that my Ex did not show up, which meant the VPO was dismissed. My son's father not showing up to court meant the VPO was dismissed, even though it was dismissed right before court because he voluntarily traveled to Wings of Hope and dropped it. My son's father motioned to me to remain silent and not make Morgan Stewart aware that I was in the vehicle, and I heard more of the conversation than I believe he intended, which severely frightened me that this random DHS worker was upset that his personal false allegations against me were no longer going to be detrimental for me in regards to a protective order.

42.    After the dismissal of the VPO, my son's father resumed our normal visitation arrangement, allowing our child to be in my care without any supervision. At this same time, DHS was actively investigating me without notifying me, conducting surveillance through unauthorized collateral contacts, including my child's school and other institutions.

43.    DHS did not honor my explicit instruction to direct all communications to my legal counsel, which I had provided because I was retaining private representation already, because of my divorce. They continued harassing me directly via telephone calls and unannounced visits to my residence. The agency willfully excluded the custodial parent from the investigation, violating fundamental due process standards and showing a clear bias. The agency eventually documented that I was uncooperative in their investigation, despite me offering to schedule with them on multiple occasions with my attorney present, or at least, informed of the happenings of the investigation.

44.    During this period, my mother visited Oklahoma to meet her only grandchild for the first time. Her stay lasted approximately one month. DHS, through my son's father, conveyed to me that I was not permitted to be alone with my child, but that temporary arrangements allowing contact in my mother's presence would be "acceptable." I received no official documentation or formal communication from DHS regarding this directive. I found it wildly absurd that my child's father was yelling at me and abiding by apparent DHS instructions, to

determine under what circumstances I could see my child, without ever notifying me.

45.     My son's father continued to use threats and coercion, stating that he would withhold access to our son unless I agreed to attend a DHS "safety plan" meeting and sign a plan requiring supervised contact. He explicitly told me that, while the document would say I must be supervised, it would not actually be enforced because he had no concerns about my parenting. I warned him several times, that this was dangerous and highly suspicious. I stated to him that the safety plan and cooperation with them was purely voluntary, and that it was putting our child at unnecessary risk.

46.     On the afternoon of October 4, 2024, I appeared at the Oklahoma DHS office in Stillwater for the scheduled safety plan meeting. My mother, was not invited or included, nor was it ever mentioned to me that I should bring her. However, my son's father brought his personal friend, a man I had never met, who had purportedly been "approved" to supervise me with my son. I was not consulted about this individual nor made aware of his qualifications or background.

47.    The caseworker present was the same individual who had been
involved in the coercive and improper investigatory conduct
previously described. His name is Morgan Stewart, and he bragged to
me about having a degree in HR. The meeting concluded with a formal
presentation of a safety plan document that I had consistently opposed.

48.    Despite my objections, I was coerced into signing the safety plan
due to threats of continued separation from my child and my son's
father's threats to withhold visitation if I did not comply. Immediately
prior to signing, I verbally stated to the DHS caseworker and all
present that I was signing the document under duress.

49.    I was the last individual to sign the document. Immediately after
my signature, the caseworker abruptly announced that my mother—
who had previously been "permitted" to act as a supervisor and who
had done so without incident—would no longer be approved to serve
as a safety plan monitor. This reversal was made without explanation
and after my signature had already been obtained. My son's only
biological grandmother had been deemed permissible as a Safety Plan
Monitor to conduct supervised visitation for the majority of that day,

but suddenly on the same calendar day, was not acceptable after I
signed their paperwork.

50.    My son's father immediately became visibly upset and began to
complain aggressively. He had intended for me to watch our son that
weekend, as I regularly did, because he was scheduled to work his
usual Friday overnight shift as a DJ. This arrangement was known and
well-documented by DHS. In my belief and based on the surrounding
context, DHS intentionally engineered this situation to provoke
noncompliance with the safety plan and create grounds for further
punitive action.

51.    Morgan Stewart responded to my ex's distress by stating they could
possibly make an exception and approve my mother for the time being
while they waited on her background check. I expected based on the
fact that DHS had already allowed my child to be in my care that day
with my mother present, and had also approved, without proper
vetting, my ex-husband's best friend—a man in his twenties whom I
had never met—as a qualified safety plan supervisor. Additionally,
DHS had approved at least one of my ex's family members to serve in
this role without involving me in the vetting process.

52.     Immediately after the conclusion of the safety plan meeting on

October 4, 2024, while still in the parking lot of the DHS office in

Stillwater, my son's father approached me. My son's father stated to

me, in the presence of his friend, "Don't worry if DHS doesn't approve

your mom or can't make this exception, because obviously I don't

have any concerns about you and I know you didn't do this, so I'm

going to drop him off anyway." I responded with a simple

acknowledgment and returned home.

53.     Approximately fifteen minutes later, after I arrived home, my

mother informed me that she had received a call from the DHS

caseworker. Morgan Stewart began interrogating her in a hostile and

accusatory tone. Morgan Stewart appeared to be attempting to elicit an

admission from my mother that I was guilty of child abuse. My mother

firmly stated that I would never harm my child and that she had no

concerns about me as a mother. Upon hearing this, the caseworker

abruptly terminated the phone call. He never collected information

from her that would be necessary to run a background check and

approve her to supervise my time with my son.

54.    Almost immediately after this incident, I received a phone call from
my son's father, who was angry and agitated. He informed me that the
same DHS caseworker had just contacted him directly—without
contacting me or my attorney—to inform him that my mother would
not be approved to supervise me with my child. The caseworker had
made this decision based solely on the brief and confrontational phone
call, without performing a background check, collecting any
documentation, or adhering to DHS policy and procedure. It became
obvious to me, that this situation was intentionally set up, because the
Safety Plan Meeting included documentation that my son's father's
best friend and Aunt were already approved and would be tasked with
supervising their plan.

55.    At no time was I contacted regarding this determination. I was
given no opportunity to respond or appeal. The caseworker's actions
were arbitrary, retaliatory, and clearly intended to obstruct my access
to my child despite the absence of any substantiated abuse or evidence
of risk. The approval of unrelated individuals aligned with my ex-
husband and the simultaneous rejection of my own mother, without
vetting or cause, demonstrates extreme bias and collusion.

56.    On the evening of October 4, 2024, shortly after the coerced
execution of the safety plan and despite the caseworker's subsequent
rejection of my mother as a safety monitor based on no lawful
procedure or evidence, my son's father arrived at my residence and
dropped off our child. He voluntarily drove our child to my residence
that afternoon and dropped him off for the night, between
approximately 4:30-6:00PM.

57.    Around 10:30 p.m., an unexpected knock on the door startled me. I
looked through the window and observed two Payne County Sheriff's
deputies and a female DHS caseworker I did not recognize. Despite
knowing my legal right to refuse entry, I reasonably feared escalation,
including forced entry or the potential for my child to be removed
under duress or false pretenses. Given the hostile and unlawful conduct
from involved parties thus far, I believed non-compliance would lead
to worse outcomes. So I made the decision to open the door.

58.    Upon entering, the female caseworker—whose identity had not
previously been disclosed to me—immediately began to question me
in an aggressive and accusatory manner, repeatedly demanding to
know if I was aware I had violated the safety plan. I asserted my Fifth

Amendment right against self-incrimination and stated clearly that I would not answer further questions. I then disengaged and walked away from the conversation.

59.   The caseworker informed me that my son's father needed to leave work immediately and retrieve our son. I called him. Shortly afterward, the two sheriff's deputies left my home without incident or comment.

60.   The caseworker continued to state that she needed to speak with her supervisor. She left the house on several occasions and remained outside for long periods in her vehicle. As the night dragged on with no follow-up, I became suspicious. The caseworker's repeated absence and lack of transparency heightened my concern.

61.   Sometime after midnight, I awoke and was immediately disturbed by the prolonged silence and lack of follow-up. My son's father had still not retrieved our son, and no one had knocked. I stepped outside and was shocked to find my street lined with multiple sheriff's vehicles, far more than had previously been present. The DHS caseworker's vehicle was there, as well as what appeared to be my son's father's truck. This substantial increase in law enforcement

presence suggested an escalation of unknown cause. At that point, my

mother and son were still asleep inside.

62.     Upon stepping outside, my son's father began screaming at me

without provocation.

63.     When I asked the DHS caseworker what was going on, she

informed me that she was taking my child into state custody.

64.     I was handed paperwork informing me that I was required to appear

at a "show cause" hearing scheduled for Tuesday, October 8, 2024, in

the morning.

65.     On Sunday, October 6, 2024, I began attempting to prepare for the

hearing. I knew I needed my legal counsel, but due to the weekend, I

could not reach my attorney until Monday morning at 8:00 a.m, less

than 24 hours before the hearing. When I was finally able to speak

with him, he agreed to attend the show cause hearing on my behalf.

66.     I inquired whether I could vacate my home so that my child could

remain there with my mother. DHS stated that this was not possible

because my mother was not a legal resident of Oklahoma. I also asked

whether my child could stay with my biological relatives in North

Carolina. I was told this, too, was not an option.

67.    I did not worry about finding a friend to serve as a placement because I knew my son's father had several responsible biological relatives in Oklahoma. DHS refused to place my son with any of his paternal relatives and instead placed him with strangers in Tulsa, without disclosing his location to me or providing any method of contact.

68.    At the show cause hearing on October 8, 2024, both myself and my son's father appeared with our privately retained attorneys. Our attorneys had only about five minutes before the hearing to review the pleadings, which was also the first time I had seen the petition. Both attorneys informed us prior to entering that this was a foregone conclusion. They warned us that there was little to no chance that the judge would permit them to speak or offer evidence, and they explained that we should expect this case to last 12 to 18 months. They advised us that our chances of prevailing at the show cause hearing were essentially zero.

69.    Prior to DHS taking my child into custody, I received a DHS "findings letter" summarizing the results of their investigation. The letter stated clearly that the allegations of physical abuse were

unsubstantiated as to both parents. The only allegation DHS claimed

was "substantiated" was neglect—threat of harm, in relation to the

marks on my child's back, but no evidence was ever provided showing

that either parent caused those marks or failed to take appropriate

action.

70.    Despite this, the petition presented at the show cause hearing falsely

alleged that I had physically abused my child as if the abuse had been

witnessed or confirmed. This directly contradicted DHS's own

investigative findings.

71.    During the hearing, both of our attorneys vigorously cross-

examined the DHS caseworkers. When confronted by my attorney and

asked directly whether she had just lied on the stand, the caseworker

admitted, "Yes, I just lied." This admission was made under oath.

72.    DHS argued that my child was removed from my custody due to a

violation of the safety plan, based on the claim that I had been

"unsupervised" with my son. However, during cross-examination, my

son's father's attorney, Thomas Swafford asked the caseworker who

was present at my residence when DHS arrived on the night of the

alleged violation. The caseworker acknowledged that my mother was

present at the home. His attorney responded, "Then I would argue that is not unsupervised in the least," effectively undermining the premise for removal. I later learned that Thomas Swafford previously worked at Murray Law Firm in Stillwater with James V. Murray.

73.     Despite glaring issues and the apparent lack of credibility of DHS witnesses, the presiding judge, Judge Worthington, appeared disengaged. At one point, when my attorney was exposing contradictions in the testimony and holding DHS to account, the judge interrupted the proceedings and told my attorney that he needed to "calm it down" or she would hold him in contempt of court. This halted the momentum of our defense.

74.     Following this judicial warning, no further substantive arguments were permitted. Judge Worthington then stated, "I am siding with DHS," and ruled in favor of the agency.

75.     I was left with the undeniable conclusion that my child had been removed unlawfully, based on unsubstantiated allegations, hearsay, and knowingly false testimony, with the court disregarding evidence, dismissing due process, and enabling DHS misconduct without meaningful oversight.

76.    Upon returning home from the show cause hearing and thoroughly reviewing the legal paperwork provided to me, it became abundantly clear that my son's father had orchestrated or manipulated circumstances to direct scrutiny and blame toward me while concealing his own misconduct.

77.    According to the documentation and what I was later informed, when DHS informed my son's father that they were taking our son into state custody, he allegedly lunged at the DHS caseworker and threatened to kill her. This level of violence and aggression far exceeded any behavior I had ever exhibited, yet it was not reflected in the justification used by DHS for the removal, nor was it used against him in court. I was not present during this incident and will never know precisely what occurred or what prompted DHS to ultimately remove my son into stranger foster care.

78.    I also discovered that DHS never obtained a judicial warrant for my child's removal, as required under Oklahoma law unless the statutory emergency exception applies.

79.    During this time, I was informed that if my son remained in traditional foster care, I would receive only one hour of supervised

visitation per week. DHS made clear that my son would be kept outside of Payne County and removed from the community and services I had spent years securing for him.

80.    My son was only four years old and diagnosed with autism, was taken from his home, medical providers, therapy, educational plan, friends, and both biological parents—all without a valid court order or legal justification. DHS intentionally disrupted every known stability in his life. In the span of two months, he was placed in at least five different schools, including one near Norman. This instability is particularly damaging to children with autism, who rely heavily on consistency and structure.

81.    As juvenile deprived (JD) court proceedings advanced, the filings authored by Payne County Assistant District Attorney Brenda Knipp became increasingly biased, defamatory, and divorced from reality. Each new filing falsely vilified me while portraying my son's father in a favorable light. These filings were replete with distortions and omissions and gave me the clear impression that I was the target of deliberate and strategic legal sabotage.

82.    I contacted every available resource, including non-profit legal organizations, family advocacy groups, and child rights agencies. Nearly all of them failed to respond, and those that did responded only months later with dismissive or unhelpful feedback. I filed formal complaints with every governmental agency I could identify, seeking intervention or oversight, to no avail.

83.    Through my own research, I began connecting with other families and reading similar stories that exposed patterns of unlawful child removals, civil rights violations, and systemic abuse of power by DHS and local courts. My understanding of the legal deficiencies and fraud in my case deepened.

84.    I grew increasingly convinced that my attorney, along with my son's father's attorney, had manipulated the process and deliberately withheld key legal options and defenses from us. I had paid my attorney significant sums only to discover he was complicit in my legal downfall. The day before a scheduled JD court hearing, I confronted him and demanded to know why he had failed to assert obvious legal defenses and failed to file motions that could have preserved my parental rights.

85.    My attorney became defensive and hostile. He stated, "Don't accuse me of being part of the child trafficking ring that stole your son." I was stunned by this remark, as I had never used those words or terminology. The comment appeared to be a spontaneous, defensive reaction, and in hindsight, it was the first time I believe he told the truth.

86.    He informed me that he would be filing a motion to withdraw from my JD and divorce cases. I informed him that I would not oppose this, as I had already decided to terminate our attorney-client relationship. I understood that I would have to appear pro se at the next JD hearing and make my own formal entry of appearance.

87.    I continued filing formal complaints with every state and federal agency I could identify. I contacted supervisors, oversight boards, and administrative offices. These efforts eventually triggered the attention of Justin Hoenshell, the DHS Regional Director for Payne and, to my knowledge, Logan Counties. He contacted me personally following a conversation I had with the new DHS permanency supervisor assigned to my son's case.

88.   The permanency supervisor became the first DHS official to
meaningfully review the documentation I provided and assess DHS's
own case records in context. Upon a brief and objective review, she
acknowledged that my claims were credible and that the Department
had legal exposure if the matter continued in its current trajectory.

89.   Although I understand DHS never acts in the interest of the parent,
I saw for the first time DHS beginning to alter its recommendations. A
new permanency caseworker was assigned, and from that point
forward, DHS began advocating—per my request—for a 50/50
accessibility between me and my son's father.

90.   DHS revised its written reports to reflect more accurate and truthful
descriptions of past events and the current family dynamics. These
changes, though limited and cautious, appeared to be an
acknowledgment of the excessive and unjustified nature of their earlier
actions.

91.   At the next JD court hearing, which occurred the same day my
former attorney formally withdrew, DHS stood up and recommended
immediate reunification with both parents. They also suggested, at
minimum, that the JD case be downgraded to family-centered services,

which would remove the matter from court jurisdiction but still allow DHS oversight. This proposal would have ended the judicial component of the case while maintaining safety planning and monitoring.

92.    To my surprise, the attorney appointed to represent my son—who had made no previous contact with me and had shown no advocacy on my son's behalf—stood and agreed with DHS's recommendation. I gave my full support to the proposal. My son's father's attorney appeared visibly confused but eventually voiced agreement as well.

93.    The Judge Worthington hesitated. She stated that she "did not like what was going on" and admitted that she did not understand the situation. She declared the proposal "out of order" and refused to grant it. A stand-in Assistant District Attorney, previously unknown to me, also objected on behalf of the State and insisted the proceedings continue as originally scheduled.

94.    As a result, the JD proceedings remained active, and my son continued to live in Norman, Oklahoma, away from me and far removed from his established support network in Stillwater.

95.    In the days and weeks that followed, I continued my independent investigation and advocacy on my son's behalf. I spent countless hours reviewing case law, reading other parents' stories, communicating with legal reform groups, and preparing filings. It became a full-time endeavor to protect my son.

96.    This case has been catastrophic to my personal and professional life.

97.    The JD court proceedings have continued, with my son's father's attorney—who is not a party to any petition against me—repeatedly litigating against me directly. He advocates for his client to receive more time and for the process to accelerate, while simultaneously undermining my position as a parent.  Rather than challenge the sufficiency of the State's petition, which alleges deprivation, he has used the proceeding to target me. This conduct is prejudicial, improper, and should be addressed by the Court.

98.    As of May 2025, I reflect on the events that have unfolded throughout the JD proceedings and feel it is necessary to address several extreme and alarming concerns related to the judicial process and conduct by state actors in my case.

99.    Judge Susan Worthington adjudicated my child deprived solely on the basis of the father's stipulation to the petition. I explicitly refused to stipulate and exercised my right to a trial. In response, Judge Worthington expressed open irritation, stating that a trial would be burdensome due to time constraints. She informed me there was "a 0% chance" I would prevail, stating directly that she had already adjudicated my child deprived—thus rendering the trial meaningless before it could occur.

100.    I submitted a discovery request to the District Attorney's Office, as was my right. Assistant District Attorney Brenda Nipp began to engage in conduct that I experienced as harassing and retaliatory. Though she had previously stated in open court that her discovery materials were prepared, she later delayed production and claimed they were not ready. Discovery was ultimately provided through a third party at the final permissible moment—immediately before pretrial proceedings commenced.

101.    Prior to that production, ADA Brenda emailed me demanding that I deliver a new, packaged thumb drive to her office within an unreasonably short deadline. I complied. Shortly after, I received a

second demand for another thumb drive. I complied again. These acts

appeared intended to inconvenience and intimidate rather than serve

any legitimate function.

102.   I was deterred from proceeding to trial due to the judge's remarks

and the prosecution's tactics. Lacking legal representation and under

extreme duress, I chose to stand moot—a neutral procedural posture—

in order to avoid further harm. I anticipated this would be more

acceptable to the court than any active defense. I was correct; Judge

Worthington was visibly pleased with this choice, as it allowed the

court to proceed without the "inconvenience" of a trial.

103.   Despite receiving discovery, nearly none of the information I

lawfully requested was included. Key documentation—such as the

original sheriff's report, ER records, and police statements that

corroborated my innocence—were omitted. In their place, I received

previously dismissed allegations, fabricated and manipulated reports

from the Saville Center, and irrelevant screenshots of private Facebook

posts taken out of context. No legitimate basis was provided for the

exclusion of exculpatory material.

104.   Among the included documents the incident where the sheriff's
deputy apparently attempted to pursue an assault charge against me
based on the false claims. It is clear from the report that the charge
failed because I did not confess to something I did not do. I was also
alarmed to discover that private, unrelated social media posts from a
private Facebook group had been surveilled and submitted as evidence.
None of these materials bore any relevance to whether I abused or
neglected my child.

105.   These actions reflect systemic abuse and a misuse of the
DA's discretion. They served no valid legal purpose and appeared
designed solely to discredit and intimidate me.

106.   On the same day I stood moot, I signed the Individualized Service
Plan (ISP). I had already completed every item on the ISP prior to its
issuance. My compliance was complete and verifiable, but barred from
being considered evidence and court admissible until I signed the ISP.

107.   Following my signature on the ISP, Judge Worthington ordered
reunification in regards to me. The order did not include any
acknowledgment of my ISP completion, which I found unusual but did

not contest. The court record indicates this outcome in the official minute entry.

108.   As of this day of this writing, my son is scheduled to return to my physical custody on May 23, 2025—his last day of pre-kindergarten in Norman Public Schools. I remain unsure of what lies ahead.

109.   Both the DHS caseworker and the permanency supervisor have separately expressed concern regarding my son's father's behavior.

110.   My child's father has openly expressed anger and hostility toward DHS. He has told DHS representatives that he "hates" them and is "mad" because they are "ruining his chance at full custody." These statements constitute direct admissions that he views DHS not as a neutral child welfare agency, but as a tool to achieve sole custody in an adversarial strategy to eliminate me from our child's life.

111.   These revelations have confirmed my longstanding concerns regarding his manipulative intentions and emotional instability. His inability to self-regulate, especially in interactions with DHS, reflects dangerous impulsivity.

112.   During this period, my son has shown extreme strength and progress but the emotional trauma of separation remains. I have lost irreplaceable time with my son.

113.   My son has also displayed clear distress during visitations. When I leave his kinship foster home, he attempts to block the door with his body, spreading his arms and crying, "No, Mommy can't leave."

114.   When I bring my son home on weekends, he expresses—without prompting—that he does not want to return to his foster placement or his father. He states he wants to stay at "Mommy's house." These are voluntary disclosures from a young child, untainted by suggestion or coercion. He clearly feels safe, secure, and emotionally bonded with me.

115.   As of this writing, I remain deeply concerned for the safety and wellbeing of both myself and my son following the conclusion of the juvenile deprived (J.D.) proceeding. Although reunification is scheduled to occur and DHS involvement is ending, I anticipate that my child's father will immediately initiate a new custody battle through the ongoing divorce case in Payne County.

116.  I have not disclosed these anticipations to court officials because it has become clear that my concerns are routinely dismissed. However, I am certain that my son's father intends to file a motion for full custody in the family court as soon as DHS closes its case.

117.  Throughout the duration of the J.D. case, my child's father has exhibited repeated patterns of litigation abuse and legal manipulation. I have no doubt that he intends to exploit findings, records, and procedures from the J.D. case to obtain full custody and permanently separate me from my son.

118.  I am terrified that I will not survive the prolonged and inevitable litigation in family court that lies ahead.

119.  DHS personnel, including the assigned caseworker and supervisor, have acknowledged that this J.D. case was functionally determinative of future custody outcomes. They have conferred with the Payne County DA's office and my son's attorney, all of whom recognized that the disposition in the deprived case would establish a precedent— if not de facto outcome—for the custody determination under the divorce docket.

120.   I am not safe. My child is not safe. There is no mechanism within the current legal system that offers meaningful protection to victims of legal and psychological abuse. My former spouse has learned that the judicial system can be weaponized with impunity. There is no recourse for me once family court proceedings resume under the divorce action.

121.   I still do not know the origin of the marks that were discovered on my son's back, but they occurred while he was in the exclusive custody of his father. These injuries have not been adequately investigated or explained.

122.   The most optimistic outcome I can realistically envision is a 50/50 custody arrangement, which my soon to be former spouse will likely undermine or refuse to honor. I expect he will withhold my son, create barriers to access, and continue to use the court system to harass and destroy me.

123.   I have already lost my career, my education, my physical and mental health, and my financial stability. I am effectively trapped in the State of Oklahoma with no way to relocate to my family or support network due to the jurisdictional restraints of child custody law.

124. My son is a brilliant, kind, creative, and loving child. He is innocent. He deserves peace, security, and love. Yet he has been subjected to institutional failure, coercive separation from his primary caregiver, and emotional trauma—all under the guise of "protection."

125. The judicial system has failed not only me but countless others. My story is not unique. It follows a pattern of systemic abuse where due process is suspended, parental rights are violated, and children are commodified in service of financial interests.

126. I submit this affidavit under oath with the hope that exposing these unlawful and unethical practices may contribute to the broader accountability and reform that is desperately needed. I affirm, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

127. That I now make this affidavit and serve it upon the US District Court for the Western District of Oklahoma as an exhibit for Gregory Ashley Moyer v. Murray, et al Case No. 5:25-cv-000429.

128. That I herby swear and affirm under penalty of perjury that the above statements are true and correct to the best of my knowledge.

FURTHER AFFIANT SAYETH NAUGHT

Dated:___18th___day of _____May_____, 2025.

_Tessie Taylor_

Tessie Taylor

Address: 310 S Redlands RD #13 Stillwater, OK 74074

PERSONALLY came and appeared before me, the undersigned Notary, _Tessie Taylor_

_____ who is a resident of _Payne_ County, State of

Oklahoma, and makes this his statement and Sworn Affidavit upon oath and affirmation of belief

and personal knowledge that the matters, facts and things set forth above are true and correct to

the best of his knowledge.

Subscribed and sworn to before me this _18th_ day of _May_, 2025.

by _Sherrie Bean_ Notary Public.

My Commission Expires: _3/27/26_